O

# United States District Court
# Central District of California

AZADWINDER SINGH,

               Petitioner,

     v.

DAVID MARIN et al.,

               Respondents.

Case № 5:26-cv-00643-ODW (DFMx)

**ORDER GRANTING *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE [3]**

## I.   INTRODUCTION

Petitioner Azadwinder Singh brings a petition for a writ of habeas corpus against Respondents David Marin, Warden of Adelanto Processing Center, Immigration and Customs Enforcement ("ICE"); Ernesto Santacruz, Jr., Acting Director of ICE Los Angeles Field Office; Todd M. Lyons, Acting Director of ICE; Kristi Noem, Secretary of U.S. Department of Homeland Security ("DHS"); and Pamela Bondi, U.S. Attorney General.  (Pet. ¶¶ 37–43, Dkt. No. 1.)  Petitioner also moves *ex parte* for a temporary restraining order requiring his immediate release from custody.  (Ex Parte Appl. ("TRO") 11, Dkt. No. 3.)  Respondents fail to timely oppose the request.  For the reasons discussed below, the Court **GRANTS** the TRO.

## II.    BACKGROUND

Petitioner is a citizen of India.  (Pet. ¶ 7.)  On September 28, 2023, he entered the United States at or near Calexico, California, without inspection or valid entry documents.  (*Id.* ¶ 8.)  Upon arrival, Petitioner approached border officials and informed them of his fear to return to India.  (*Id.*)  Respondents then detained Petitioner for approximately seven weeks before determining that he was neither a flight risk nor a danger to the community.  (*Id.* ¶ 9.)  On November 18, 2023, Respondents released Petitioner on parole "for urgent humanitarian reasons or significant public benefit" pursuant to 8 U.S.C. § 1182(d)(5)(A).  (*Id.*)

Respondents subsequently placed Petitioner in removal proceedings.  (*Id.* ¶ 10.)  Petitioner complied with all conditions of his release.  (*Id.* ¶ 11.)  He attended all court hearings and biometric appointments, timely filed for asylum, and otherwise obeyed all laws of the United States.  (*Id.*)  Petitioner also obtained a work authorization, a Social Security number, and a California driver's license, and has worked as a forklift operator at Amazon to support himself and his family.  (*Id.* ¶¶ 11, 16.)  Petitioner has immediate family members in the United States, has developed strong community ties here, and has no criminal record.  (*Id.* ¶ 16.)

On January 20, 2026, ICE arrested Petitioner during his scheduled check-in.  (*Id.* ¶ 12.)  ICE re-detained Petitioner without prior notice, an opportunity to be heard, or any showing of changed circumstances.  (*Id.* ¶ 13.)  ICE later transferred Petitioner to Adelanto ICE Processing Center ("Adelanto") where he is currently held.  (*Id.*)

At the time of his arrest, Petitioner was suffering from multiple medical conditions, including abdominal pain, lingering fever, and severe toothache, and he was under the care of a doctor.  (*Id.* ¶ 18.)  ICE arrested Petitioner despite him presenting evidence of these conditions during his check-in.  (*Id.*)  Following his detention, ICE held Petitioner in a freezing room, which caused Petitioner's medical conditions to worsen, leaving him shaking and unable to speak.  (*Id.*)  When ICE transferred Petitioner to Adelanto, he informed the facility officials that he was sick

and needed medical attention.  (*Id.*)  However, ICE officers simply told Petitioner that "he looked fine and that he did not need to see a doctor."  (*Id.*)  When Petitioner was finally seen by medical staff, the staff told him he had a tooth cavity, but that "he could not be treated at the facility as they did not have the required filling."  (*Id.*)  The staff gave Petitioner "salt and iodine to rinse his affected tooth when the aching became unbearable."  (*Id.*)  Petitioner has also been suffering from a severe throat infection causing him extreme difficulty eating, swelling, redness, and persistent pain.  (*Id.*)  Since his re-detention, Petitioner has also been experiencing constant headaches, anxiety, depression, sudden mood swings, and severe sleep deprivation.  (*Id.*)

Based on these allegations, on February 12, 2026, Petitioner filed a Petition for Writ of Habeas Corpus on the grounds that his re-detention violates his Fifth Amendment right to due process.  (*Id.* ¶¶ 44–48.)  That same day, Petitioner filed this Application for a Temporary Restraining Order.  (TRO.)  Petitioner requests that the Court order Respondents to immediately release Petitioner from custody.  (*Id.* at 11.)

### III.    LEGAL STANDARD

A temporary restraining order ("TRO") is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008).  The standard for issuing a TRO is "substantially identical" to that for a preliminary injunction.  *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).  Pursuant to Federal Rule of Civil Procedure ("Rule") 65, a court may grant preliminary injunctive relief to prevent "immediate and irreparable injury."  Fed. R. Civ. P. 65(b).  To obtain relief, a plaintiff must meet the "*Winter*" factors: (1) the plaintiff "is likely to succeed on the merits"; (2) the plaintiff "is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [the plaintiff's] favor"; and (4) "an injunction is in the public interest."  *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20).

# IV.    DISCUSSION

The Court briefly addresses its jurisdiction to review Petitioner's claims, before turning to the merits of the TRO.

## A.    Jurisdiction

The Court must first consider whether it has jurisdiction to review Petitioner's TRO. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007) ("[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction."). Under 8 U.S.C. § 1252(g), a court does not have jurisdiction to review "any cause or claim" challenging the execution of "removal orders." However, a "district court may consider a purely legal question that does not challenge" the execution of a removal order. *United States v. Hovsepian*, 359 F.3d 1144, 1155 (9th Cir. 2004).

Here, Petitioner raises a question of law as to whether his re-detention complies with due process. (*See generally* TRO.) As such, the Court does not review the Attorney General's authority to execute removal proceedings. Instead, the Court confines its analysis to the narrow legal question properly before it: whether Petitioner's re-detention violates his right to due process. As the Court addresses only the legality of Petitioner's re-detention, the Court has jurisdiction to review Petitioner's TRO. *See Hovsepian*, 359 F.3d at 1155.

Moreover, under 28 U.S.C. § 2241, the Court has authority to adjudicate a habeas corpus petition alleging that a person is being held in custody "in violation of the Constitution or laws or treaties of the United States." "[T]he essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973). Here, Petitioner alleges that his re-detention without notice and a pre-deprivation hearing before a neutral decisionmaker violates his constitutional right to due process. (Pet. ¶¶ 21–23.) Thus, Petitioner also properly invokes the Court's habeas jurisdiction.

**B.    Merits of the TRO: *Winter* Factors**

Having determined that the Court has jurisdiction over Petitioner's TRO, the Court now turns to its merits under the *Winter* factors.

*1.    Likelihood of Success on the Merits*

The first *Winter* factor "is the most important," and "is especially important when a plaintiff alleges a constitutional violation and injury." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023). Petitioner argues that he is likely to succeed on the merits because his re-detention and revocation of his release on conditional parole without a pre-deprivation hearing violate his procedural due process rights. (TRO 5–9.)

Courts examine procedural due process questions "in two steps." *Ky. Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460 (1989). First, courts must ask whether there is a liberty interest with which the government has interfered. *Id.* If the answer to the first question is "yes," courts then examine "whether the procedures attendant upon that deprivation were constitutionally sufficient." *Id.*

The Fifth Amendment protects all persons from being "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. It is settled law that noncitizens within the United States are entitled to due process "whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). The government's release of an individual from detention creates "'an implicit promise' that the individual's liberty will be revoked only if they fail to abide by the conditions of their release." *Calderon v. Kaiser*, No. 25-cv-06695-AMO, 2025 WL 2430609, at *2 (N.D. Cal. Aug. 22, 2025) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972)).

Here, when Petitioner was released from his initial detention, he acquired a liberty interest which entitles him to due process. *Doe v. Becerra*, 787 F. Supp. 3d 1083, 1093 (E.D. Cal. 2025) ("The Supreme Court has repeatedly recognized that individuals who have been released from custody, even where such release is conditional, have a liberty interest in their continued liberty."). Thus, the Court finds

that Petitioner has a protected interest in his continued liberty and the procedures used against him must adequately protect that interest. *See Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953) (noting that once an alien "passed through our gates," they "may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law"). Accordingly, the Court turns to whether the procedures used against him comport with the Constitution. *Thompson*, 490 U.S. at 460.

In evaluating similar due process claims, courts employ the three-part test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *See, e.g.*, *Yagman v. Garcetti*, 852 F.3d 859, 864 (9th Cir. 2017). The *Mathews* test calls for a consideration of (1) "the private interest that will be affected by the [government] action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional procedural safeguards"; and (3) "the [g]overnment's interest, including the fiscal and administrative burdens that the additional or substitute procedures would entail." 424 U.S. at 321. Courts in the Ninth Circuit "have regularly applied *Mathews* to due process challenges to removal proceedings." *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206–07 (9th Cir. 2022) (collecting cases applying the *Mathews* test in this context).

a)    <u>Private Interest</u>

Starting with the first *Mathews* factor, the Court considers the scope of Petitioner's liberty interest as a noncitizen who has been released on conditional parole for over two years. *Diaz*, 53 F.4th at 1207; (TRO 7).

It is well established that the Fifth Amendment protects noncitizens from unlawful detention during removal proceedings. *Zadvydas*, 533 U.S. at 690. Freedom from arbitrary imprisonment is a core liberty interest and one that "lies at the heart of the liberty that [the Due Process] Clause protects." *Id.* When the government grants release on parole at its discretion, due process attaches to safeguard the parolee's liberty because "termination [of parole] inflicts a 'grievous loss'" on the individual.

*Morrissey*, 408 U.S. at 482. By granting release on parole, the government makes an "implicit promise" that a noncitizen's liberty will be revoked only for failing to comply with the conditions of release. *Young v. Harper*, 520 U.S. 143, 147–49 (1997) (citing *Morrissey*, 408 U.S. at 482). That promise creates a protectable liberty interest grounded in the parolee's reliance on the government's assurance that it will not arbitrarily return the parolee to custody. *Id.*

Here, Petitioner first acquired a protectable liberty interest on November 18, 2023, when Respondents released him on parole "for urgent humanitarian reasons or significant public benefit." (Pet. ¶ 9.) Respondents granted parole after determining that Petitioner posed neither a flight risk nor a danger to the community. (*Id.*) In doing so, Respondents "implicit[ly] promise[d]" that Petitioner's liberty would be revoked only if he failed to comply with his release conditions or if circumstances changed with respect to flight risk or dangerousness. *See Morrissey*, 408 U.S. at 482 ("The parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions."). Petitioner, therefore, possessed a protectable interest in his liberty during the pendency of his removal proceedings, contingent on compliance with his parole conditions and the absence of such changes.

b)    <u>Risk of Erroneous Deprivation</u>

Having determined that Petitioner held a protectable interest in his continued freedom, the Court next considers whether Respondents' failure to provide notice and a pre-deprivation hearing before revoking his parole created a risk of erroneous deprivation. Petitioner contends that re-detention is permissible only to prevent flight risk or to protect against danger to the community. (TRO 8.) Petitioner argues that his re-detention serves neither purpose. (*Id.*)

Where, as here, a parolee has not received notice or a pre-deprivation hearing, "the risk of an erroneous deprivation of liberty is high." *Pablo Sequen v. Albarran*, No. 25-cv-06487-PCP, --- F. Supp. 3d ---, 2025 WL 2935630, at *11 (N.D. Cal. Oct. 15, 2025) (citation modified). Civil immigration detention, which is

"nonpunitive in purpose and effect," is justified only when a noncitizen presents a flight risk or a danger to the community. *See Zadvydas*, 533 U.S. at 690.

As discussed above, Petitioner retained a protectable interest in his continued liberty so long as no material change rendered him a flight risk or danger to the public and he complied with his release conditions. Respondents released Petitioner on parole after determining that he posed neither risk. (Pet. ¶ 9.) The record contains no indication that Respondents reassessed Petitioner's risk of flight or danger to the public or found any violation of his release conditions before re-detaining him. (*See generally* TRO.) By revoking Petitioner's parole without first evaluating whether circumstances had changed, Respondents created a substantial risk of wrongful deprivation. In doing so, they breached their "implicit promise" that Petitioner would enjoy his liberty so long as he did nothing to forfeit it. *See Morrissey*, 408 U.S. at 482. Accordingly, the Court finds that the risk of erroneous deprivation is high.

c)    Respondents' Interest

Finally, the Court considers Respondents' interest in maintaining their current procedures. Although providing a bond hearing or other pre-deprivation form of due process may impose some "fiscal and administrative burden," *Diaz*, 53 F.4th at 1209 (quoting *Mathews*, 424 U.S. at 335), Respondents have offered no evidence that affording Petitioner a pre-detention hearing would impose an undue administrative or financial burden. As such, the Court gives this factor little weight, especially when balanced against the substantial liberty interest at stake and the heightened need for adequate procedural safeguards to prevent an erroneous deprivation of that interest.

In sum, the Court finds that Petitioner has shown that, under *Mathews*, he was entitled to notice and an opportunity to be heard before Respondents re-detained him. As Respondents failed to provide Petitioner with notice and a pre-deprivation hearing, Petitioner has shown a likelihood of success on the merits of his due process claim.

    2.    *Likelihood of Irreparable Harm*

As to the second *Winter* factor, Petitioner contends that absent a TRO, he will remain unlawfully detained and continue to suffer "constitutional, physical, psychological, and economic" harm.  (TRO 9–10.)

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'"  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  "[I]n cases involving a constitutional claim, a likelihood of success on the merits usually establishes irreparable harm."  *Baird*, 81 F.4th at 1048.

As discussed above, Petitioner brings a due process claim which is likely to succeed on the merits.  He has also suffered, and continues to suffer, serious medical conditions, including abdominal pain, fever, toothache, throat infection, headaches, anxiety, depression, mood swings, and sleep deprivation.  (TRO 9–10.)  Should the Court deny his TRO, these conditions will only worsen because Respondents are unable, or unwilling, to provide Petitioner with the medical care that he requires.  (*See id.*)  Thus, the Court finds that Petitioner has established irreparable harm, and the second *Winter* factor also weighs in favor of temporary injunctive relief.

    3.    *Balance of Equities and Public Interest*

The last two *Winter* factors "merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Public interest concerns exist "when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution."  *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005)).  "[T]he public has a strong interest in upholding procedural protections against unlawful detention," and "in the efficient allocation" of resources.  *Vargas v. Jennings*, No. 20-cv-5785-PJH, 2020 WL 5074312, at *4 (N.D. Cal. Aug. 23, 2020).

The balance of hardships tips strongly in Petitioner's favor.  *See Winter*, 555 U.S. at 26 (requiring the balance of hardships to "tip strongly" in the moving party's favor).  Absent relief, Petitioner faces continued detention without due process

for an indefinite period. Allowing constitutional violations to persist serves "neither equity nor the public's interest." *Galvez v. Jaddou*, 52 F.4th 821, 832 (9th Cir. 2022). Accordingly, the Court finds that both the balance of equities and the public interest favor injunctive relief.

Having found that all *Winter* factors weigh in favor of injunctive relief, the Court **GRANTS** Petitioner's TRO.

## V.   CONCLUSION

For the reasons discussed above, the Court **GRANTS** Petitioner's TRO. (Dkt. No. 3.) It is hereby **ORDERED** that:

- Respondents shall **IMMEDIATELY RELEASE** Petitioner;

- Respondents are **ENJOINED** from re-detaining Petitioner absent compliance with constitutional protections, which include, at a minimum, pre-deprivation notice and a hearing. At any such hearing, Respondents shall bear the burden of establishing that Petitioner poses a risk of flight or danger to the community; and

- Respondents shall **SHOW CAUSE**, in writing only, to be received by the Court no later than **February 20, 2026**, as to why the Court should not issue a preliminary injunction in this case. Petitioner may file a reply by **February 24, 2026, at 10:00 a.m.** The Court **SETS** a hearing on the preliminary injunction for **February 27, 2026, at 9:00 a.m.**, via Zoom.

**IT IS SO ORDERED.**

February 13, 2026

_____

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**